Testmasters v. Singh, and we'll hear first from Mr. Cradiville. May it please the Court. Your Honor, my name is Chris Cradiville from the Dyke & McCock Smith Law Firm, and I represent Appellant and Cross-Appellee Testmasters Educational Services, whom I will refer to today as TESS. By way of very brief introductory explanation, TESS's longtime lead appellate counsel, David Skank, who's argued the previous iterations of this case, has recently been appointed a judge of the Dallas Court of Appeals, so it falls to me to make this argument in his stead. Has the whole group been with this case the whole time? What's that, Your Honor? Has all the lawyers been with this case the whole time? Your Honor, I believe Ms. Ashmore was probably in college when this case began, and I was a second-year associate, and I'm now in my 15th year of practice, so it has been going for a while. Educated several children. Career case. But, Your Honor, and that's what brings us here today, because as much as every lawyer would like a career case, litigation is designed to end. I know this Court — Is there anything about the prospective ruling we will make that has potential to end it? Your Honor, Judge Southwick, I believe there is a straight line out of this maze, and I'd like to point — If you win, the case is over for good? Is that what I'm going to hear? Your Honor, if the straight line out of the maze that's proposed in our brief and that I'm going to propose to you here today is followed, I believe that would bring this long and tortuous saga to an end. And let's start with the easy part. That's my goal today, is to show a way to bring this to an end. The easy part is disposing of the infringement claims that Mr. Singh has brought against my client, Tess. And in this regard, Judge Atlas got it absolutely right, with one minor caveat that I'll get to momentarily. It's a simple application of the collateral estoppel bar of Testmasters 1, 2, and 3, a bar that's been freshened each time, as recently as 2008. And by freshened, I mean that that issue preclusion has been reiterated. You don't get to start fresh every time you litigate an issue or re-litigate an issue, in this case, and lose. How long do we have to go before there's some changes that are significant? Your Honor, this Court's leading precedent on that is the Texas pig stands v. Hard Rock Cafe case, in which there was about a 60-year gap, 60 years, over half a century, between the original litigation in the 1930s and this Court's ruling in 1992. So there has to be, and Testmasters 2 properly recognizes— That's a whole different world. That's true as far as it goes, Judge Higginbotham. Communication, facilities, et cetera, et cetera. But there is an important public policy that's served by res judicata and its collateral estoppel wing, which is litigation cannot go on in perpetuity, and you don't get to re-litigate. In Testmasters 2, the re-litigation was filed two days after this Court's opinion issue, two days. That's a long way from 60 years. Well, here we have a little bit more than two days, but the trend is obvious. Mr. Singh is going to attempt to re-litigate this secondary meaning issue until the world ends or until this— What's wrong with secondary meaning is it seems to lend itself to that, and I forget which one of the Roman numeral testmasters that we said it in, but we certainly left open that this could be readdressed later. What we now have is something like 13 years, I think, from the last ruling on—at least on Singh's secondary meaning. Is there any way—well, why don't you proceed, but I do think the nature of the beast is that this is a re-litigable issue. Well, Judge Southwick, I think in Testmasters 2, this Court recognized, as Judge Gilmour had recognized, that Mr. Singh holds the keys to his own jail cell and that the proper procedure is not a collateral attack. It's not a new proceeding attempting to re-litigate. It's to go back to Judge Gilmour under Rule 60 and file a Rule 60 motion. That's been the case since Testmasters 1. That was something Judge Gilmour explicitly recognized and that this Court explicitly recognized in Testmasters 2. For reasons I don't know, Mr. Singh and his counsel have never gone that path. They have never gone the Rule 60 motion in Judge Gilmour's Court in the original litigation. That would be the procedurally proper way to proceed, not to launch this seriatim series of collateral attacks, which will never end. Specifically, what did Judge Atlas err in doing in her ruling? Well, Judge—I think Judge Atlas got it absolutely right with regard to Mr. Singh's infringement claims, with the exception that his state law claims— No, Judge Higginbotham, I think Judge Atlas, who's a very intelligent judge who we all have the utmost respect for, made a very simple mistake. She did all the preface, but what mistake did she make? She applied the wrong analytic lens, Judge. In our brief, we compare this secondary meaning analysis to the track and field events of a sprint versus a high jump or a pole vault. She treated it as a foot race between Mr. Singh and Tess, when in fact it's about clearing the bar. Now, my track and field days are long, long over. The analogy that occurs to me is a kid—I have little kids—trying to ride a ride at the carnival. And the question is, are you tall enough to get on the ride? There's a little Snoopy holding a bar, and you're either above it or you're below it. And if you're above it, you get on the ride. It doesn't matter if the kid behind you is shorter, taller, has a ticket, doesn't have a ticket. This Court's precedence on secondary meaning in its seven-factor test, take a look at those factors as to the applicant in a silo. And the proper evaluation would have been— I could be wrong. She put us in a race with Mr. Singh, who is collaterally stopped from asserting his secondary meaning rights. That's Test Masters 1, 2, and 3. The proper analysis would have been our secondary meaning evidence, which is substantial and compelling, on each of those seven factors. Look at Tess's summary judgment evidence. I look back over the history thing, every fact finder said this is descriptive. You never have developed a secondary meaning. Well, this is Tess's first time trying to establish secondary meaning, at least outside the state of Texas. This is our first at-bat. Mr. Singh's had multiple swings and struck out each time. What you said was that you were the master of your own complaint and you wanted to go national and all that. You failed on that score, but you got Texas. This is our first time to attempt to go national, Judge Higginbotham. We have never before attempted, prior to this case, which I'll call Test Masters 4, to go national. We are not attempting to relitigate our national rights. We are attempting to establish them for the first time. You challenged Judge Atlas as applying the wrong standards, but as you acknowledged, she did apply the seven-factor test. You thought perhaps she was too controlled by what the Trademark Trial and Appellate Board, whatever the name of that is, did. But that is a matter of how one reads her opinion. Can you drill down a little bit for us? Why, after she goes through these seven factors and weighs them and articulates her ruling, why can you say she applied the wrong standards? First and foremost, Judge Southwick, she did grant summary judgment, declaring there's no genuine issue of material fact. These were voluminous motions both ways, with a lot of evidence going both ways. At an absolute minimum, I'd say there was a genuine issue of material fact for jury resolution. This is uniquely ill-suited to summary judgment. Let me ask you this. What percentage of your business is in Texas? Your Honor, off the top of my head, I do not know that. Just give me a rough estimate. We are a Texas-based company. Texas is our home and primary market. You said you conducted the largest part of your business in Texas. Is that wrong? No, that's correct. Tess's home market is Houston, and Tess is the strongest in Texas. But we do have students from 49 states, from many foreign countries. We have the website testmasters.com. You have students from 49 states.  In Austin, the residence is really an imperfect marker of the geographical dispersion of your market. In these testing fields, because you're testing students. The very fact that we're having this discussion weighing the evidence, weighing the relative strength of Tess's evidence, is why this was not appropriate for resolution at the summary judgment stage and why these are consummate fact questions requiring, at a minimum, a jury resolution. And we think, beyond that, if this was properly treated as clearing the bar or seeing if we're tall enough to ride the ride, without regard to Mr. Singh's own competing evidence of secondary meaning. What do you want us to do? Your Honor, very simply. Affirm Judge Atlas's dismissal with prejudice of Mr. Singh's infringement claims. Infringe, do the same with his state law claims, except make them with prejudice. Absolutely. I'm trying to get the easy part out of the way first, Judge Higginbotham. The hard part is to find that our evidence, as submitted, was controlling when properly evaluated without reference to Mr. Singh's competing and estopped evidence of secondary meaning. When you look at our evidence in a silo, as this Court's Zaterans and Nilo Spice and other seven-factor tests indicate should be done, we clear the bar. We're tall enough to ride the ride. Let me ask you this. A big part of your summary judgment evidence seemed to be Dr. Cunningham's report, and she criticized that saying that his survey was limited to individuals taking engineering exams and LSAT in Texas. So how do you pause that? If this Court looks at Dr. Cunningham's actual report, which we did include in our record excerpts, you'll find that Judge Atlas's criticism of that report is not entirely well taken. First of all, it included professional engineering statement students from Florida, Virginia, Arizona, and Nevada, I believe. So it was not confined to Texas. And it was designed to establish our national reputation in one of our primary, not our primary, but one of our primary products, which is professional engineering exam preparation services. Strictly limited engineering exams? No, Your Honor. Actually, our largest product is scholastic aptitude test, plain old SAT preparation. I think probably our best-known product is at least arguably Cunningham's. Cunningham limited herself to the professional engineering preparation. That was her survey. The reason the survey is important is this Court's precedents, including Zatteran's, put a lot of emphasis on survey evidence. In Zatteran's, you had two surveys, both of which showed consumer awareness in the mid-20 percents, as to a product called Fish Fry here in the New Orleans metropolitan area. In Dr. Cunningham's survey, she found 50.7 percent awareness of TESS's professional engineering exam preparation services. And moreover, in contrast to Judge Atlas's criticism of that survey, Dr. Cunningham did control to make sure that these folks were not responding that they were familiar with Mr. Singh's company. It was limited to professional engineering applicants to make sure that Mr. Singh's mark did not in some way taint the response pool. But looking more broadly at the seven-factor test, Your Honors, this Court has always said there's no one controlling factor. It's a fact-sensitive, holistic analysis where these seven factors are weighed. Again, to me, that's a consummate jury question, not a professional exam question. Didn't we in Testmasters I deal with an appeal from a jury trial on this very issue, and we set it aside saying, in fact, there was not sufficient evidence even to have gone to the jury, on secondary meaning but for Singh, not for TESS? In Testmasters I, there was, this Court deemed there to be manifestly inadequate evidence of secondary meaning. That's still a possible standard with a little bit of history in this case. Obviously, you're saying you get beyond that, but it's not unheard of to rule on summary judgment or on appeal reversing as insufficient evidence. It's not unheard of, Judge Salford, but what's different now is that Mr. Singh has litigated and re-litigated and re-litigated again the issue of secondary meaning and has lost each time. He's collaterally stopped from re-litigating secondary meaning. What he cannot do offensively, he should not be allowed to do defensively either. He's using secondary meaning as a shield against our attempt to register this mark. He should not be permitted to do that because he's lost on secondary meaning. If secondary meaning is out of the case, it's out of the case for all purposes, and the analytic lens should be whether TESS clears the bar for secondary meaning evaluated in a silo. What question do you want to ask a jury? What? You want to strike a jury in Houston, and what question are you going to ask them? We're going to ask if TESS has established secondary meaning. I think there's a pattern jury charge on . . . Do you find for a punitive evidence that what? That TESS Masters Educational Services is known to a substantial part of the consuming public for its exam preparation services, whether our mark has taken on that distinctiveness. We're not a distinctive mark. We're a descriptive mark. That's what Judge Atlas held. This is the first time in this case I've tried a jury. What was that, 12, 16 years ago was it? 1999, I believe, Your Honor. Now, 16 years later, we're going to go back and ask another jury that question. Well . . . It goes right out to the same kinds of problems with regard to secondary meaning. There's no end to that. I'm not sure I follow your question, Judge. My question was simply that it's difficult for me to see, after reading her opinion, that there is anything left in this case to try. Every person, every fact finder in this case has said this is descriptive. We haven't contested that here today. We acknowledge this is a descriptive mark. And once we're in the universe of descriptive marks, the question becomes a seven-factor test. You suggest it's suggestive. We've abandoned that position, Your Honor. That was asserted below, but we did not press that on appeal. That's fine. But I just have trouble with this perpetuation of these claims. Well, Your Honor, and that's why I think res judicata, which is ultimately a prudential doctrine designed to bring litigation . . . Well, bar theirs but not ours. I mean, that doesn't close down anything. That's true as far as it goes. But they've had three strikes, three attempts to relitigate secondary meaning. This is our first time asserting secondary meaning at the national level. I know there's some . . . At the national level. That's correct. And we have secondary meaning in Texas. We at least have the mark under Judge Gilmour's permanent injunction in Texas. But it's a prudential doctrine. Litigation without end is something this Court has condemned. The Supreme Court has condemned litigation must come to an end. Res judicata is the way to end this. Three strikes and you're out. And I think that's where we're at. I'd like to turn very briefly to the other issue that brings us here today, which is the contempt portions of proceedings. Three strikes and you're out. Your analogy brings up the same problem baseball is having. You get three strikes, but you can't keep them in the box. True enough, Your Honor. If we're going to deal in the world of analogies, I think the analogy that I'd like to keep coming back to is, is Tess tall enough to ride this ride? Have we cleared this high jump bar? Have we cleared this pole vault bar, looking at our evidence? I think there are two possible answers to that. Either we've done so with compelling, controlling evidence, when evaluated with Mr. Singh's secondary evidence off the field, or we deserve a jury trial on that because they're consummate fact issues. Can you turn to contempt? You don't have much time. Yes, Your Honor. Very briefly, there's an affirmed permanent injunction, as affirmed by this court in Testmasters II, that prohibits the harassment of Tess, its officers, owners, employees, counsel, and so forth. That was violated in the most scandalous and blatant ways. Judge Gilmour did not move briskly to punish that contempt. She was deliberative. She took her time, and she imposed a remedy within her discretion. The conduct in question shocks the conscience. It was not commercial speech. It was familial aspersions that were cast in addition to commercial aspersions. I won't get into that. It's part of the sealed record before this court. This court is welcome to look at that. I won't get into it in an open courtroom. But on the commercial side, despite this injunction, Mr. Singh and his agents and employees put Internet postings and Internet videos all over the place. I think that our business was a fraud, a scam, a scheme, and this while under an affirmed permanent injunction against harassment. If that's not harassment, frankly, I don't know what is. Counsel, one of the concerns is how she wanted a corrective posting done and the argument that it was not an honest statement. I forget if it was some phrase along the lines of, I wish I had not made those statements or something like that. It seems to me that she may have gone further, the judge, than is permissible in requiring things that are not true to be said to correct things that were harassing. Your Honor, I think that was a bit of a workaround that she attempted to impose in connection with this one obstinate website called the ripoffreport.com. What Judge Gilmour was attempting to do, and frankly it's a fairly mild remedy for contempt of this degree, was to purge the contempt by removing the offensive postings from the Internet. Is that what that site's for? The ripoff report? It's a consumer awareness site. Mr. Singh claims it was a consumer awareness campaign he was conducting and he put these very hostile, defamatory, slanderous posts on the ripoff report about both Tess's business and the business of its owning family. Judge Gilmour, I think her remedy for this contempt, if anything, was fairly mild. It wasn't a forward-looking sanction. It wasn't a forward-looking punishment. It was fix what you've done. There's no monetary sanction? Other than that they had to retain Internet experts to help them purge these posts. That's correct. It was corrective and curative, not punitive. I know opposing counsel was briefly detained. That's a separate issue Mr. Levenger will be arguing. But the core of the contempt here was Mr. Singh and his companies, and for that contempt the remedy was quite mild. Okay. Thank you very much, sir. Mr. Sheehan. Thank you, Your Honor. May it please the Court and counsel. There actually is an end to this road or a way to get to the end of it, and that is to determine in this case once and for all who has the trademark rights to the 49 states outside of Texas. That remains undecided and is the reason for all the problems we're having. And we think the answer is Mr. Singh's company because it has expanded into every single state beyond Texas, every one. It has live classes. It has a major presence. It is the prior user. Trademark rights are established by use. Mr. Singh was using this trademark in all of these locations before TES ever attempted to. Let me address quickly. I want to shed some light on TES's argument. Singh's argument is there has now been a sufficient, significant intervening change that he should be entitled to have his trademark recognized. The change that this Court addressed in Testmasters 2 is a change in the minds of the consuming public and the relevant geographic market. If you're a young person in college and you want to go to law school, you are going to in all likelihood know of Singh. Singh is one of the big three. He's actually the second of the big three and moving into the first position, even going to be bigger than Kaplan. These students know Testmasters. No one has heard of TES. How many companies are in this business, the big four or five? What are they? The big four or five? I can only name three. There's Kaplan, which is the major test preparation company. There's Princeton Review. They're smaller than Singh. And there's Testmasters, Singh's Testmasters. What percentage of the market do you have your client have? I'm sorry? What percentage of the market does your client have? You know, I don't have an answer to that, Judge. A very significant one. A very significant market share. What about in California? In California, it's almost everybody. Way larger than even Kaplan in California. So that's Singh's position, that this has happened since 2001. And TES's response to that is, well, Singh, we've had litigation before, and because of that litigation, you're barred. You've forever irretrievably lost any trademark rights. Well, we know that can't be true. Just by reading Testmasters 2, because Testmasters 2 sets a standard that anticipates that you can create secondary meaning and relitigate it. Testmasters 2 contains a statement that allowed Singh to oppose in the TTAB TES's registration, federal registration. And here's the reason that Testmasters 2 allowed that. And I'm quoting from the opinion. The prior action did not address the extent of TES's trademark rights outside of Texas, and TES has established no rights to the mark outside of Texas. So we know that the market is still open. The 49 states is still open. The third reason that Testmasters 2 eliminates TES's argument that Singh just has no rights is, interestingly, in that case, Singh made a First Amendment argument that his First Amendment rights entitled him to seek a registration. And this court said in a footnote that you were going to follow the federal circuit and hold that it did not violate First Amendment rights because it is clear that the refusal to register a mark, the PTO's refusal to register a mark, does not affect his right to use it. So that's three different places where Testmasters 2 has blown away TES's only argument, that Singh has no rights. Now, in connection with that, TES does not argue about significant intervening factual change. In 120 pages of briefing, the term appears once in their briefs. Once. And that is, they make the statement, and then they say, well, the sole remedy is Rule 60. Well, first of all, that's just wrong. And secondly, it's waived. This is the first time this Rule 60 argument has been presented as in this appeal. That's the only way they mention it. They don't take that issue on at all. They don't say Singh's evidence is inadequate. They don't say it's inaccurate. They don't say it doesn't show a significant intervening change. All their marbles are in the bag. Singh just doesn't have any rights. How much has your market share gone up since the last adverse decision? I can't tell you exactly how much the market share has gone up. I can just tell you that the number of users and consumers has gone up exponentially. Hasn't that probably been true for all the testing services? I don't know. Not necessarily. Not necessarily. I mean, they have to be successful companies. Well, you do have evidence, one figure I remember, is that the revenues went from $3 million to $14 million or something like that. And what that shows is a growing business. It doesn't show secondary meaning by itself. And that's the concern I have really about both sides on the evidence here. It's one thing to say what your market share may be, and you're not sure, or some of this other evidence, but that's not enough. You've got to show that the relevant market considers this secondary meaning and identifies test masters with Singh. And I'm not sure that the evidence that you have is compelling enough, even if collateral estoppel is not a bar to your presenting it. Your Honor, proving secondary meaning is necessarily a little bit slippery because you can't just have a parade of witnesses in from the public saying, I know of Singh. Well, we did call ten live witnesses whose depositions are in the record. We did get a survey, and our survey was accurately conducted. It surveyed the proper geographic area and relevant geographic market, unlike TESs, and showed that more than 50% of surveyed people identified test masters with Singh. And in any secondary meaning analysis, that's the best you can do. The court's listed seven factors. And these numbers are in our briefing, but we show the revenue increases. We show the enrollment increases. We show the growth in geographic scope. In 2001, Singh was only in a few states. In 2013, when this summary judgment record was created, he's everywhere, including three countries. Students in every state have taken his live class. He has seminars on major campuses, major universities, all over the country regularly. Princeton and Kaplan publish ads in which they say, compare our course to Singh, to test masters, and they say, you know, we do this, we do that, we do this, he doesn't do that. That's recognition by his competitors. Media coverage has been extensive, including a CBS story, news story, on the confusion that is out there because you have two test masters offering the same product to the same market. So as for all the seven factors of secondary meaning, the significant change is that they are all still, that they are all there, and there's been significant growth in it. But let me talk about something else, Judge Southwick, that I think answers your question. One of the most telling things about Singh's recognition is the degree and extent of confusion that these students are experiencing as a result of TES activities. We have affidavits, we have declarations, we have recorded phone calls, we have e-mails, there's a very substantial record on this, and they all follow the same pattern. For example, in Illinois, Singh moves into Illinois in 2001. TES moves into Illinois in 2010. When TES arrives, Singh starts getting phone calls from people saying, I signed up for the wrong course. What happened? How can this be? That has been a pattern that's been repeated in many, many states. So this confusion, this level of confusion, is an indication of, one, Singh's consumer, I mean, secondary meaning. McCarthy says you're not going to have consumer confusion unless you have a senior user. Let me ask you a question. If we simply affirm Judge Atlas's conclusions, where does this leave the litigation? To affirm it? Your Honor, it leaves it in a pretty bad place because it just maintains the status quo that we've had for the last 13 years. This confusion goes on. Singh is powerless to correct it. The students continue to lose their money. What's the pathway to conclusion then? Well, I think that this court can resolve the case. Any remand would only be to carry out orders of decisions in accordance with the judgment. Singh is entitled to have a summary judgment that he owns the trademark rights to test masters for all 49 states in the test preparation industry. And TES is in here complaining that they should have gotten a federal registration. They had a summary judgment hearing in the TTAB. They lost it. Judge Atlas upheld it. This court can affirm that. This issue of who gets this mark, what is this marketplace going to look like for the next 100 years, can be decided by this court in this case so that this will stop, so that these kids who saved their money, I'm not trying to make a jury argument here. This is just a fact. Let me ask you, how do you demonstrate the level of confusion? I mean, I guess you had summary judgment evidence on that, right? We do. And what is that evidence? Well, first of all, we have depositions from we just selectively stopped at 10. We took depositions at 10 students, went around the country. These are all now practicing lawyers who devoted or volunteered their time to tell their story. That's one thing. We also have declarations from another 70 or so. We have 100 or more recorded phone calls where these confused consumers who have signed up for TES call SING. We don't know how many of these confused consumers didn't call SING. It wouldn't occur to me to do that. If I'd been cheated by TES, I'd be communicating with them. But we don't have any of TES's communications with these students because they said they had a computer crash. I mean, isn't this a similar problem to the one you described where you can't parade a lot of witnesses up to talk about what do you identify with the TES master's mark? That's right, and that's why you prove secondary meaning with this circumstantial evidence. That's why things like revenues and... I mean, the level of confusion is sort of a similar problem, it seems to me. Yes, it is. You cannot physically produce every shred of evidence of confusion. You just couldn't do it. I mean, logistically it would not be possible. All I can say is it is an enormous problem, and the people who have a stake in what this court decides to do are not just these litigants but these college kids. There's nobody, not one instance, none, that we have ever seen or that TES has produced where a TES student, a student looking for TES, mistakenly came to Robinson. Never happened. All the confusion runs in one direction. So the litigants here both put on programs at the same place at the same time? Yes. Actually, let me address that because that's a very good question. That used to be the case in many cities, but here's what actually happened. TES put up a website in which they falsely represented from day one, when they got into the LSAT business, that they had taught thousands of students and gotten them into the program of their choice. That's just an outright falsehood. They hadn't taught any students. And that they had these expert instructors, which was an outright falsehood. They didn't have any. So that's how they started. Then they would get people to sign up for the class in certain cities, and then when they didn't get enough registrants, a week or so before, they'd just cancel the class until these kids would come to Houston. One of them actually did, from Florida. They used a fictitious map to make it appear to students that they had courses all across the country, and you'd click on it, give you an address. These addresses were fabricated. We had one student who ended up at a hospital in Atlanta. That's the address that she was given, and the phone number turned out to be the head of anesthesiology. She called TES and said, what's going on? I came for class, and they said, oh, we canceled that one. So this is the kind of problem that's happening, and it raises another point, Judge Davis, that I think is really important here. Texas pig stands has four elements of collateral estoppel besides the usual ones that we're used to about being necessary to the judgment and so on. The fourth one is no special circumstances shall exist that make application of collateral estoppel inappropriate or unfair. That's an important element. It wasn't mentioned in Testmasters 2. It may well not have been argued in Testmasters 2. Testmasters 2 really got its economic change or factual change from pig stands. That was really the basis of that authority. No special circumstances that make it unfair. These circumstances make it unfair to simply keep stamping it as collateral estoppel. That means while intervening change has been recognized as an exception to collateral estoppel by this court, under special circumstances they simply fail to prove all the elements. And we think these special circumstances have been shown. One more quickly, and I'll go to contempt. Today, if you go to TES's web page and you click on their LSAT link, it will bring up a map, just like Robin Sings, and it will ask you, do you want a live class or do you want an online class? You click on a live class, you get a city. Or, in some cases, a choice of cities. In Florida, there are several of them. You click on the city, the message comes up. Unfortunately, we no longer offer live classes in this city. Now, Robin Sing offers live classes in that city, and in 94 out of the 100 cities they do this with, they've never held a live class. So they are continuing to deceive and mislead these consumers in order to capture people looking for Sing, deliberately attempting to fool them. All you have to do is look at their website, and there it is. This is all in the summary judgment record? Yes. Yes, every single thing I've said is thoroughly backed up by the record. Now, as for the contempt issue, Mr. Sing posted material on the Internet. Some of that material was strictly defensive or material intended to clarify this confusion. Some of the material was critical. Let me ask you a question. As I listen to your recitation of the dispute and the characterization of it, increasingly I wonder how in the world you can handle this on a summary judgment. It sounds like just a jury case. Because you've got this factor and this factor and this factor, and they're lying, know you're lying, and so forth. Your Honor, I would— The only way I know to resolve those things is the old principle, call your first witness, and that just cuts out a lot of the smoke. Your Honor, I'm a big believer in jury trials, but in this case we just don't need one, and the reason that we don't is because there's no dispute about who the first user is. Well, by the very character of trademark law and the dynamic market you're working in, there is no such thing as a final adjudication in the sense of a dynamic market because things change, and so you're going to be at each other for some time. Am I missing something here? You would say that significant intervening factual change is an issue that goes to a jury? Well, I'm saying that—two things. I'm saying that this is a—you're really reviewing, Judge Atlas was, the de novo, the PTO's determinations, et cetera, and you end up with a whole set of conclusions and so forth which go off on summary judgment. My question is, it doesn't have the cleanness of any of these matters. Those seem like factual determinations. Even her opinion reads as if she's resolving factual matters. What do we do with that? May I answer? Sure. Well, again, I would say that if what you're going to determine in a trial is who is the first user in these states and who's the dominant user and does this party have secondary meaning, those issues are not going to be controverted. I understand, but that's what you're talking about. Yes. Yes, that's what we're talking about. I'm going to give you another minute to finish your attempt. Oh, thank you. Okay, thank you. All I want to say about contempt is that Judge Gilmour swept every single reference to the Israelis and TES off of the Internet without reading what she was ordering to be taken down. It's overbroad. Much of the material was not harassing at all. It was merely clarifying this confusion where Robin Singh fairly stated, TES is not us. So that's all taken down. And so that is a violation of Mr. Singh's First Amendment rights. He has a right to speak. Now, the harassment that Testmasters II focused on was actual direct contact that Singh had had with, or allegedly had, with TES employees. That was harassment. And this Court listed like seven different events and said that's fairly called harassment. None of those events had anything to do with posting content on third-party websites, which is all he did this time. Okay, thank you very much. Thank you. Okay, Mr. Levenger. Thank you, Your Honor. May it please the Court. I'd like to talk about a very different issue here, and that's the order of contempt and incarceration against Mr. Sheehan here. The order is just not defensible, and I ask that the Court strongly and publicly condemn it because it's just not supportable. It imposed, without due process, an order of contempt. Mr. Sheehan had neither notice nor an opportunity to be heard. It was not supported by any evidence of wrongdoing on the part of Mr. Sheehan, and it imposed a remedy of incarceration that's just not supportable. And by the way, it was not a brief incarceration. It turned out to be that way, but Judge Gilmour made it clear that Mr. Sheehan would be incarcerated for up to five days or until such time as his client purged the alleged contempt. So it was not brief. Normally, if someone is placed in confinement, it's until they purge themselves. How would he purge himself in this? He couldn't, Judge Shakenbotham, and that was the problem with it. That points very strongly toward a punitive action rather than it seems to be. I think that's right. Civil contempt can, of course, be remedied by incarceration, but the problem is that you have to hold the keys to the prison in your own pocket, and he didn't. He had no ability to purge the alleged contempt. His client held the key, and the court held the key. What was the conduct that was the basis of her ruling? Against Mr. Sheehan, it's absolutely unclear, Your Honor. Sorry? Against Mr. Sheehan, it's utterly unclear. There is no evidence, let alone clear and convincing evidence, that Mr. Sheehan did anything that the injunction prohibited or failed to do something that the injunction required. Well, I thought she indicated that he should have advised his client against posting some of the abusive remarks on the Internet. Well, that's one thing she said. There was no evidence of any direct violation of the injunction. Mr. Sheehan did not harass or threaten TES. There's no contention of that. Mr. Sheehan did not post or cause to be posted anything on the Internet. Was there anything more in this record than that the trial judge thought that the client was engaged in harassment, et cetera, et cetera, and that the lawyer should have stopped it? Apparently, that's what she was saying, that the lawyer should have stopped it. And yet, if the contempt order against Mr. Sheehan was based upon his giving advice or failure to give advice, number one, the injunction said nothing about the lawyer giving advice or not giving advice. There wasn't any proof whether he did or didn't give advice, I gather. Well, that's the other problem. There's no evidence of what advice he gave or didn't give because he properly invoked the attorney-client privilege, and the court had no answer to that. The court did not order him to disclose attorney-client privileged information. The court recognized the propriety of his assertion of the attorney-client privilege. So there was no evidence of what he said or didn't say. You followed a 28-J telling us about the waste management opinion from this circuit from a few months ago. A fairly good argument, it seemed to me, that the process that was due was not given to Mr. Sheehan, notifying him of what might be pending at the hearing. If that is true, should we even get to whether there was evidence of contempt? I mean, he wasn't given the proper process, if we make that whole thing, which we haven't yet done by any means. Should that end our analysis of the contempt issue? It's never been properly presented and just needs to be vacated? Well, Your Honor, certainly it can be vacated on the grounds he lacked due process. There's really no arguable basis for claiming he received due process, but yet this court, in both the waste management case and in other cases, in cases where they found the lack of due process, have gone on to look at the merits of the contempt to see whether it's warranted. There's a case cited in our brief that's written by Judge Smith where he found the lack of due process, but then went on and said in no event should this case go back on remand because there's just no evidence to support the contempt, or in that case, the sanction. And that's exactly what the court did in the waste management case. It found no due process, but it went on and said, and moreover, there's multiple reasons why the contempt is not warranted, and that's the case here. Well, the due process may reach beyond the warrant of notice. It may also contain an additional component that is baseless. It's notice or the lack thereof in this case. Either one of those wings would trigger due process concerns. I think that's right. There's also the lack of an opportunity to be heard. When the court essentially sprung this on Mr. Sheehan about midway through the hearing, he had no opportunity to defend himself. He was attempting to defend himself on the fly, and this court has held that that is not due process. Now, the court also seemed to, in its ever-shifting grounds of contempt, suggest that Mr. Sheehan didn't have a good faith basis for making the arguments he was making, and yet it can't be contempt for a lawyer to simply professionally and ethically represent his client, and that's all he was doing. The arguments Mr. Sheehan was asserting were reasonable and in good faith. For example, he said that the injunction did not specifically enjoin the Internet content, and that's a valid, he just made that argument, that's a valid, reasonable, good faith argument. It only enjoined direct interactions between SING and TES. This court can see that from the Testmasters II opinion. It doesn't reach this type of conduct, posting of Internet. And moreover, Mr. Sheehan argued reasonably and in good faith that if the injunction could be so construed, then it's an unconstitutional prior restraint, and that argument, too, was supported by what this court held in the Testmasters II opinion. Finally, as one of its other ever-shifting grounds for contempt, the court seemed to base it on the notion that Mr. Sheehan should be vicariously liable for what it perceived to be the conduct of his client, and there's no basis whatsoever for holding a lawyer in contempt based on vicarious liability. For all these reasons, lack of due process, no evidence, and an order of incarceration that is simply unlawful, not to mention one that interferes with the lawyer's ability to zealously represent his client, I ask that this contempt order, order of incarceration, be reversed, really in the most strong terms possible, because this should not have happened. Okay. Thank you, Mr. Levinger. Okay, Mr. Craddoville, back to you. Thank you, Your Honor. May it please the Court. I think what you've just heard from Mr. Sheehan is a classic my-evidence-is-better-than-your-evidence jury argument, which, as you noted, Judge Higginbotham, shows why there's really only two ways out of this box today. One is to accept my argument and apply the res judicata bar and grant test its national trademark registration. The other way out of the box is to send this back for trial on we-like-our-evidence-too, we-like-our-evidence-every-but-bit-as-much-as. You don't take a position with regard to contempt matter, do you? Oh, Your Honor, on the contempt as to Mr. Singh, we have a very strong position that his conduct and his postings, particularly those of a familial nature, shock the conscience, were scandalous and well-warranted contempt. As to Mr. Sheehan, we do not take a strong position. No one likes to see lawyers detained, even briefly. The contempt here was with the client, Mr. Singh. We defer to the Court on how to handle the . . . You don't take any position with regard to Mr. Sheehan? Your Honor, our focus is on ending this litigation with regard to trademark and upholding the contempt order as against Mr. Singh. I'm taking up your other time. What's the significance of the contempt order if no penalties were imposed? Your Honor, there was a curative aspect to Judge Gilmour's contempt order as against Mr. Singh that he had to remove these deeply offensive, deeply troubling postings that he had put all over the Internet, including videos. We submitted in the sealed record some of these videos. It's directed at the client, not to the lawyer. Directed at the client. It's directed . . . Judge Gilmour's permanent injunction, Judge Higginbotham . . . That's a remedy directed at the client's conduct. At the client's conduct, absolutely, Your Honor. That doesn't have anything to do with the lawyer. I'm not taking a position on Mr. Sheehan's contempt. We'll defer to the Court's wisdom on that. Has that been done, the curative action? It has, Your Honor. There was a seriatim series of orders from Judge Gilmour on the contempt as each of these postings was removed. So we think that was well within her discretion on contempt. Well, were we to reverse the contempt as to Singh, what is the effect of that? The curative has been done. I assume the curatives could be removed. The harassing, in your view, postings could reappear. Is that . . . They could very well reoccur. The pattern in practice, if Your Honor looks at our brief in the contempt action, there's been years and years of this sort of harassment. It took Judge Gilmour a long time to lose her patience and to impose this curative remedy. If the Court were to reverse, I think it would be an invitation for Mr. Singh to resume that well-documented pattern of offensive and troubling conduct. And that would also violate that permanent injunction that this Court, a prior panel, affirmed in Testmasters II. So Mr. Singh is operating in a unique position. This would be scandalous from somebody not under an injunction. For somebody operating under an injunction, it's particularly troubling and deserving of contempt. If anything, we think Judge Gilmour was a little light on the contempt remedy since, as Your Honor pointed out, it was curative, not disciplinary. What do you say about the counsel's argument about confusion about whose test it was? Your Honor, we like our evidence every bit as much as he likes his evidence. Ours is at 42 through 45. In our brief, we go through and present, I think, compelling, if not controlling evidence on each of these seven factors. We're a larger company than Singh, according to our evidence. We are a full-service company that offers a variety of exams. We are the market leader nationally in professional engineering exams. And while we all know that law school applications have dropped off a cliff since 2008, UT's class is about 20 percent. This country needs a lot more engineers, and high school kids continue to take the SAT, and graduate students continue to take the graduate admissions tests. So this is the same story we've heard over and over from Mr. Singh. My company is growing. Everybody wants to go to law school. The LSAT is exploding. Did you have a survey on confusion? Dr. Cunningham's survey did not go into confusion per se, but it did establish that 50.7 percent of respondents identified Houston Tests, my client, as the leader in professional engineering exams nationally. On engineering? On engineering, Your Honor. That's how we started. That's the opposite on the LSAT. And that's what Judge Atlas tried to do in her summary judgment order. She sort of split the babysit. They're very good on the LSAT. We're the national leader on the professional engineering exam. I think she was trying to position the case for a mediated settlement, and she sent us to a good aggressive mediation. Unfortunately, it didn't happen, so we're left with an analytically flawed summary judgment order that beautifully set up a mediation, but in terms of an application of the seven-factor test, isn't there. Thank you, Your Honor. Thank you, sir. Okay, Mr. Sheehan. Well, of course, Judge Atlas' job is not to set up a mediation but to make a ruling, and the only ruling that could be made here, based on the evidence that's in the summary judgment record, is that the mark belongs to Singh on the basis of being the senior and prior user in every single state, which is the relevant geographic market. Not surprisingly, Dr. Cunningham's survey showed 50.7 percent of respondents identified test masters with TES, and Judge Atlas commented on that by saying, well, yeah, half of your survey group was from Texas, and Singh isn't even allowed to do business in Texas under test masters, so naturally nobody from there is going to identify him. So she said that survey is basically not worth paying attention to. Counsel, where are we if, in fact, there were a jury trial or the evidence was otherwise undisputed that test masters has TES's version of it, secondary meaning for engineering, and LSAT perhaps is more in your bailiwick? Is either one of you entitled to a mark? Yes, Your Honor, we are. I mean, it's a very good question, but the law is pretty clear. You can't divvy up a trademark. You're going to end up with confusion. Under the doctrine of related goods and services, if Singh proves that he is entitled to a trademark in the test preparation industry, and in this case his proof necessarily concentrates on the LSAT, then he has rights to other companies that a consumer would probably confuse because of Singh's identification and trademark in the LSAT market. Well, you have rejected TES's evidence, but let's say their evidence was equally strong not just in Texas but nationwide, that they had similar identification on engineering. Is your fact that you were the first user trump TES's evidence? Yes, it does. Under the law, it does. And I want to make this comment to Judge Southwick. Part of this secondary meaning evidence that they have, that they're talking about, has been established since we believe they should have been barred from doing it ten years ago. A little late, though. I know. So they're out in the market after we tried to stop them, and if we can't stop them this time, it's never going to get stopped. It's just going to continue. But I understand the point you're on, and, no, I do not believe that you can take a trademark and divvy it up and say you can have TES Masters for engineering or you can have TES Masters for the East Coast, and, Singh, you can have it for LSAT or you can have it for this area. It could also mean, it seems to me, that neither one of you have sufficient proof of secondary meaning if you have this sort of divided understanding of what the mark means. Well, we think that TES's evidence of secondary meaning is far weaker than they're making it sound because most of it is composed of secondary meaning evidence in Texas, which isn't relevant. Texas is not the relevant geographic market here. And so if you isolate out only the evidence of secondary meaning in the other 49 states, they don't pass the test. I mean, doesn't TES have, in effect, have the mark in Texas now for engineering? They have it in Texas for all purposes. For all purposes. Yes. So what you say can't be done has, in effect, been done in this case, right? Well, it's been limited to Texas, but that was the only thing that was litigated. And this court made it clear that that's, there was a summary judgment motion on that point, and they conceded that they did not have rights elsewhere. So Texas is what they were litigating. So the other point about this secondary meaning, in this registration process that they have been pursuing since 2002, which, by the way, means that this isn't the first time they've gone for it, that they've sat back and waited until the right moment to seek national rights. They sought national rights as soon as Test Masters I was decided. They amended their Texas-only application to register to seek the whole country. So that's how far back their effort to get this was. But I think it's significant that the applications that they have before the PTO that the TTAB denied and ATLAS confirmed were applications that were done under, I believe it's Atlanta Max, Section 2D, which is we want registration without showing secondary meaning. I guess they don't test trademark on the bar exams, do they? I don't know, Judge. You know, it's been so long since I've taken the bar exam, I don't know what's on them. Okay. Thank you very much. Thank you. Mr. Lavender, you don't have anything to add, do you? No. All right. Good. Thank you very much. Thank you very much, Counselor. We have your case. Thank you.